IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
*Norfolk Division*



FILED
IN OPEN COURT

AUG - 6 2024

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 2:23-cr-127 |
| JESSICA BRUNELLE, | |
| Defendant. | |

## STATEMENT OF FACTS

The United States and the defendant, JESSICA BRUNELLE (hereinafter, "the defendant"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1. Beginning in or about March 2021 and continuing thereafter until in or about September 2022, within the Eastern District of Virginia and elsewhere, the defendant, her co-defendants, and co-conspirators, were knowingly and unlawfully involved in the possession and distribution of wholesale quantities of narcotics, including, but not limited to cocaine and fentanyl.

2. The defendant used multiple cellular phones, including a cellular phone assigned the number (757) XXX-3187 and a cellular phone assigned the number (757) XXX-0771 to facilitate and further the conspiracy.

3. The defendant used her cellular phones to coordinate the purchase and distribution of cocaine and fentanyl. One such person she coordinated narcotics transactions with using the -3187 phone was co-defendant Corey WRIGHT ("WRIGHT"), who served as a source of supply to the defendant for narcotics.

4. On May 11, 2022, the defendant discussed narcotics during a telephone call with WRIGHT. The defendant stated, "…it's like…when I go to get something then—you know what



1

I'm saying? It's basically I pay for one and he give me one..." WRIGHT interrupted, saying, "So you just gettin' everything on credit and ye' ain't buyin' nothin' no more?" The defendant responded, "If that's what you want to call it. I don't—" and WRIGHT interrupted again, saying "It is!" The defendant responded, "Oh okay." WRIGHT proceeded "...that's what it's call if ...[i]f I pay you what I owe you and you give me something else...that's...that I owe for you. That's frontin' it to me." In this conversation, WRIGHT was explaining to the defendant how "fronting" narcotics works because another individual was providing her narcotics on credit.

5. In the same conversation, the defendant and WRIGHT continued to discuss pricing and distribution of narcotics. The defendant stated, "he brought me the half, I um, got done with the quarter, until... ." WRIGHT interrupted, stating, "And gave him the money and—yeah." The defendant responded, "...and I gave him two—one-fifty for that. And then...when I go...when I need to go get...at the end of this week. I'ma—I gotta give him two-fifty...[t]o be able to get anything else." Later in the conversation, the defendant stated, "I don't know all the lingo and language and sh*t." WRIGHT responded, "A front is—a front is when..." and the defendant interrupted with "I get it now, you just explained it to me." When the defendant used the words, "half" and "quarter" she was describing quantities of narcotics.

6. On the same day, the defendant and WRIGHT discussed "fronting" narcotics again, but this time the defendant explained how she fronted narcotics to a customer. WRIGHT stated, "So, whatchu did? Took the—uh fronted it to...how much he how you?" The defendant responded, "It's twenty dollars like usual. He's either ten dollars short, twenty. And I'm not f*ckin doin' that sh*t with him no more...No, motherf*cker! You do this to me every f*ckin' day! ... Like I'm so tired of it. ... Like he'll call me and be like, 'Can you put somethin' together?' Like, you know tellin' me what to put together and then get there and then he came out short and then what—like,



2

you want me to scoop a little bit away?" In this portion of their call, the defendant was complaining that this customer is always short on money to pay her for the drugs she is providing. When she said, "scoop a little away" she was imagining the client's desire for her to repackage the quantities of narcotics she had prepared to a decreased amount that would reflect the reduced funds the client had to purchase the narcotics.

7. The defendant also communicated with WRIGHT via text message about the distribution of narcotics.

8. On April 29, 2022, the defendant texted WRIGHT: "…your boy is not responding back to me." The defendant was referring to another co-conspirator, Malik Dillard ("DILLARD"), from whom she was attempting to obtain narcotics.

9. In the same text thread, WRIGHT responded, "I'll hit him up for you." The defendant stated, "I just wanna know how much I can get that for that we talked about." WRIGHT responded, "Less than 2." The defendant stated "Ok," after which WRIGHT informed her, "He said he'll give you a zip for 300 but he's not doing half or smaller … But don't give your price to anyone." The defendant agreed, "OK I won't," after which she added, "All right tell him I will call him tomorrow because I don't have three right now." Later in the conversation, WRIGHT stated "He's probably gonna change it to 400 or 450."

10. In the preceding paragraph, the defendant was asking WRIGHT to communicate with DILLARD in her effort to purchase methamphetamine. When WRIGHT said, "a zip for 300" he was explaining that DILLARD would charge $300 for an ounce of methamphetamine. The term "zip" referred to an ounce.

11. On May 11, 2022, the defendant informed WRIGHT that she was "about to get up with the deep creek boys." WRIGHT responded, "Ok weigh everything and it's 80 g." After the



defendant said "Ok," WRIGHT responded with a series of texts stating: "900 half," "475q," and "250 ball." In this conversation, WRIGHT instructed the defendant on prices for selling his fentanyl to "the deep creek boys", should they inquire of her. He instructed her that half an ounce of fentanyl was $900, a quarter of an ounce costs $475, and an eighth of an ounce costs $250. The term "ball" refers to an "eight ball" or eighth of an ounce.

12. As part of the same conversation, WRIGHT then stated that he would "need to come see [the defendant] early in the morning," and then instructed her, "I'll need you to bring me a blender, poster, bags, and my stuff that's there," The defendant responded "10-4," which meant she understood and agreed to comply by obtaining the requested items (e.g., blender, poster, bags, etc.), which, among other things, can be used to adulterate, expand, manufacture, and package narcotics.

13. On May 31, 2022, the defendant again discussed narcotics during a telephone call with WRIGHT. After WRIGHT asked, "You got poster board?" The defendant replied, "Um, I don't think so I'm looking for it right now. No, but you can get one at CVS." WRIGHT proceeded, "You think ... get some, get one?" The defendant responded in the affirmative and WRIGHT continued, "And ... (inaudible) umm- umm- Arm & Hammer?" The defendant responded affirmatively, and WRIGHT then advised, "A'right, I'll be over there in about fifteen, ten."

14. Narcotics distributors commonly use Arm & Hammer baking soda as an additive when repackaging, converting, or otherwise altering cocaine, fentanyl, and other narcotics. By adding products like baking soda, drug distributors are able to expand the volume of their product thereby expanding their profit.

15. On June 6, 2022, the defendant called WRIGHT. During the telephone call, the defendant stated, "I wanted you to FaceTime me because I didn't realize that bag of sh*t you gave

4

me won't tie. So, I—when I went to go and f****** grab out of my lil' case it spilled some so, I just didn't—you know what I'm sayin'? I'm tryna get as much as I can. It, like, fell on my lap and on my hand." The defendant sought to FaceTime (video call) WRIGHT because the bag of narcotics WRIGHT provided to the defendant had leaked.

16. On multiple occasions, the defendant accompanied WRIGHT when he distributed narcotics, including but not limited to methamphetamine, cocaine, and fentanyl to other drug dealers. The defendant also delivered cocaine and fentanyl on behalf of WRIGHT to customers.

17. The defendant's participation in the events described above was undertaken knowingly, intentionally, and unlawfully, and not as a result of an accident, mistake, or other innocent reason.

18. The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offense charged in this case nor does it identify all of the persons with whom the defendant may have engaged in illegal activities.

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date: 8/6/24

By: _____
John F. Butler
Luke J. Bresnahan
Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, JESSICA BRUNELLE, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
JESSICA BRUNELLE

I am JESSICA BRUNELLE's attorney. I have carefully reviewed the above Statement of Facts with her. To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

_____
Nathan A. Chapman, Esq.
Attorney for JESSICA BRUNELLE



6